**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Email: swestcot@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN BRAYFIELD, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>   v.<br><br>ADVANCED HAIR RESTORATION LLC,<br><br>     Defendant. | Case No. 2:25-cv-11547<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Benjamin Brayfield ("Plaintiff") brings this class action complaint on behalf of himself and all others similarly situated (the "Class Members"), against Advanced Hair Restoration LLC ("Defendant" or "Advanced Hair"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all persons who visited www.advancedhair.com (the "Website") and scheduled a hair transplant consultation.

2. Advanced Hair is one of the largest hair transplant clinics in the country. Defendant's self-described mission is "to modern hair restoration and make advanced solutions accessible to everyone."[1]

3. The decision to obtain a hair transplant is the culmination of a deeply personal process, often intertwined with perceptions of self-image, self-confidence, and societal expectation.

4. When Website users navigate to Defendant's Website, they do so with the reasonable expectation that the sensitive details relating to themselves and their medical appointments will be kept confidential.

5. However, Defendant aids, employs, agrees with, or otherwise enables third parties – including Google LLC ("Google"), Meta Platforms, Inc. ("Meta"), and The Trade Desk, Inc. ("TradeDesk") (collectively, the "Third Parties") – to eavesdrop on communications sent and received by Plaintiff and putative class members, including communications that contain sensitive, personally identifiable information relating to scheduled consultations for hair transplant surgery. By failing to procure consent before enabling the Third Parties' interception of these communications,

[1] *About Advanced Hair Restoration*, ADVANCED HAIR, https://www.advancedhair.com/about.

Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("ECPA"), the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632 ("CIPA"), and the California Constitution.

## PARTIES

*Plaintiff*

6. Plaintiff Benjamin Brayfield is an adult citizen residing in Santa Monica, California.

7. At all relevant times, Plaintiff maintained active accounts with Facebook and Google. When creating his Facebook and Google accounts, Plaintiff provided Facebook and Google with his personally identifiable information ("PII"), including his full name, date of birth, phone number, and email address. Plaintiff used the same device to access the Website that he did to access his Facebook and Google accounts. Plaintiff was in California when he visited the Website.

8. In or around November 2022, Plaintiff scheduled a hair transplant consultation with Defendant through the Website. To confirm the appointment, Plaintiff provided Advanced Hair with his name, email address, phone number, clinic location, and date and time of the appointment.

9. Upon accessing the Website, as alleged in greater detail below, Plaintiff Brayfield browsed for and scheduled a hair transplant consultation. Unbeknownst to Plaintiff, his communications were intercepted in transit by the Third Parties – as enabled by Defendant – including communications that contained Plaintiff's PII and sensitive appointment details. Neither Defendant nor the Third Parties procured Plaintiff's prior consent to this interception.

*Defendant*

10. Defendant Advanced Hair Restoration LLC is a Washington limited liability company with its principal place of business located in Bellevue, Washington.

1    11.    Defendant possesses 25 offices in over a dozen states, including

2  California.[2]  Defendant owns and operates the Website.  Defendant knowingly and

3  intentionally incorporated a host of tracking technologies for marketing, advertising,

4  and analytics purposes on the Website without disclosure to its users, including those

5  provided by Third Parties.

6                                    **JURISDICTION AND VENUE**

7    12.    This Court has subject matter jurisdiction over this action pursuant to 28

8  U.S.C. § 1331 because it arises under a law of the United States (the Electronic

9  Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental

10  jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this

11  action is a putative class action, and Plaintiff alleges that at least 100 people

12  comprise the proposed class, that the combined claims of the proposed class

13  members exceed $5,000,000 exclusive of interest and costs, and that at least one

14  member of the proposed class is a citizen of a state different from at least one

15  defendant.

16    13.    This Court has personal jurisdiction over Defendant pursuant to Ninth

17  Circuit precedent because of Defendant's contact with the forum state.  First, by

18  integrating the technologies that allowed Third Parties to wiretap communications,

19  Defendant acted intentionally.  Second, Defendant knew that the harm would be felt

20  in California because Defendant allowed consumers located in California to schedule

21  consultations via the Website.  Third, Defendant expressly aimed its conduct at

22  California because Defendant, in the regular course of business, allows consumers to

23  schedule hair transplant consultations at any of the 5 office locations it owns

24  throughout the state of California.  Finally, Plaintiff and putative class members were

25  harmed in California because that is where Third Parties—as enabled by

26  Defendant—wiretapped Plaintiff and putative class members.  *See Herbal Brands,*

27  _____

28  [2] *Id.*

*Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1094–95 (9th Cir. 2023), *cert. denied* 144 S. Ct. 693 (2024).

14.    Pursuant to 28 U.S.C. § 1391 venue is proper in this District because a substantial portion of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**A.    Overview of The California Invasion of Privacy Act and the Federal Wiretap Act**

15.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA") to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

16.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

17.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of

communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360–61 (1985) (emphasis added, internal citations omitted).

18.    To establish liability under California Penal Code section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

19.    As part of the Invasion of Privacy Act, the California Legislature additionally introduced Cal. Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential

communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

20.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal Penal Code § 632(c).

21.    Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation of CIPA.

22.    Similar to CIPA, the Federal Wiretap Act ("ECPA") creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[3]

23.    Although the ECPA does not apply if a "person is a party to the communication or one of the parties to the communication has given prior consent to such interception[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[4]

**B.    Defendant's Website**

24.    Defendant owns and operates the Website.  Unbeknownst to users, Defendant knowingly integrated the Facebook Tracking Pixel, the TradeDesk Adsrvr Pixel, and Google tracking technologies (collectively the "Tracking Technologies") onto the Website to assist with its marketing efforts.

25.    When prospective patients access the Website, Defendant fails to inform them that it will disclose and assist Third Parties with intercepting their sensitive appointment details.  In fact, Defendant guarantees that it will "not share, rent or sell

---

[3] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[4] 18 U.S.C. § 2511(c)–(d).

any Personal Information it collects to any third party for third party marketing or solicitation purposes." *See* Fig. 1.

---

## Disclosure of Personal Information

Except as otherwise provided herein, Advanced Hair Restoration does not share, rent or sell any Personal Information it collects to any third party for third party marketing or solicitation purposes. Advanced Hair Restoration may, in its sole discretion, share with third parties information that is not associated with your name or identity, such as website usage information, non-personally identifiable demographic information, and aggregate user statistics. Advanced Hair Restoration may share Personal Information with third parties as described at the time you provide the information and under the following circumstances:

---

**Figure 1**

26.     While navigating the Website, users can use dropdown menus to learn more about Defendant's offered procedures and locations.  Furthermore, Website users can click one of numerous buttons to schedule in-person appointments at any of Defendant's locations for purposes of receiving "an in-depth assessment of hair loss patterns, scalp health, and medical history."  This consultation is conducted by one of Defendant's "hair restoration specialist[s]."  *See* Fig. 2.



**Figure 2**

27.     To book a "free consultation," users are prompted to select the clinic location of their choice and the date and time of the appointment.  Then, users are required to fill out form fields that request their first name, last name, phone number and email address.  *See* Fig. 3.



**Figure 3**

28.     Unbeknownst to its patients, Defendant systematically discloses sensitive and confidential appointment booking details and PII to Third Parties.

29.     As courts across the country have recognized, the identifiers that the Tracking Technologies capture—email address, unique identifiers, and User IDs—constitute "directly personal information."  Nonetheless, Defendant discloses this information without its patients' knowledge or consent.

## C.    Tracking Technologies, Generally

30.    Web browsers are software applications that allow users to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

31.    Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the user's device via web browsers.

32.    Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request.  HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

33.    A user's HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the user's screen as they navigate the Website).

34.     Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

35.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The Google tracking technologies, TradeDesk Adsrvr Pixel, and Facebook Tracking Pixel, embedded on the Website by Defendant, constitute Source Code.

**D.     Google's Advertising Technology**

36.     Google is one of the most valuable publicly traded companies in the world, with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

37.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[5]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.  Google generated an even higher percentage of its total revenues from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

38.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and

---

[5] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at
https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

39.    One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous Code, which allowed webpages to load faster and improved data collection and accuracy.

40.    Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more session initiated from one or more devices."

### 1. *The Google Analytics Tracking Code*

41.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

42.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

43.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[6]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[7]

44.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

45.     Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

46.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you

---

[6] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

[7] *Id.*

use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the website pages and app screens that user visits), and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

47.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

48.    Google Analytics links with Google Ads, so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[8]  Such practices were in effect on Defendant's Website at all relevant times.

49.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted patients' interactions on the Website, including PII and consumer health data.  Google received at least "Custom Events" and URLs that disclosed the appointment confirmation of patients.  Google also received additional PII, including the patients' email address, IP address, device information, and User-IDs.

50.    Google collects vast quantities of consumer data through its tracking technologies.

51.    Due to the vast network of consumer information held by Google, it can match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

52.    Google then uses such information through targeted advertising.

---

[8] *Connect Google Ads to Google Analytics*, GOOGLE, https://support.google.com/analytics/answer/9379420?hl=en.

## 2.    *The DoubleClick API*

53.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[9]

54.    DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[10]  The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and "DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[11]

55.    As relevant here, however, data is still sent from the Website to Google through the DoubleClick API.  This process is akin to a person setting an old e-mail address to automatically forward messages to a new e-mail address, rather than manually updating their contact information on a number of different websites. Messages would still be sent to the old e-mail address, but would be routed to the same end recipient, the same way data sent to DoubleClick still ends up with Google.

56.    Once integrated into a website, the DoubleClick API allows a website owner to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[12]

57.    Once Defendant intercepts the Website communications through the DoubleClick API and discloses such information to Google (in real time), Google

---

[9] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

[10] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google/products/marketingplatform/360/introducing-google-marketing-platform/.

[11] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

[12] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.

has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against abuse and fraud, and personalize content and ads you see on Google and on [] partners' sites and apps."[13]

58.    For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

59.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on those habits. This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and services they are interested in.

60.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

61.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

62.    Google views and processes every piece of information collected from the Google Analytics tracking technology and DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

63.    Google partners with Defendant in its marketing efforts. The Google Analytics tracking technology and DoubleClick API are employed on the Website in the manner described throughout the Complaint.

---

[13] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### E.     TradeDesk's Advertising Technology

64.     TradeDesk is a data broker.  While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[14] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

65.     "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[15]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."  And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[16]

66.     Data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers to track users across the internet.[17]  Indeed, as McAfee (a data security

---

[14] JUSTIN SHERMAN, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY 2 (Duke Sanford Cyber Policy Program eds., 2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[15] *Id.* at 2.

[16] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROC. OF THE 2015 ACM CONF. ON ONLINE SOC. NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[17] *Id.* at 11.

---

company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[18]

67.    In short, TradeDesk is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles.  Through "cookie syncing," those profiles are shared by TradeDesk with other entities (and vice versa) to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding, where users command more value the more advertisers know about them. Thus, TradeDesk enriches the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

68.    Accordingly, TradeDesk uses pixels in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to monetize websites by installing TradeDesk's pixels and allowing TradeDesk to collect as much information about users as possible (without consent).

69.    Of course, TradeDesk also benefits from this arrangement because websites and apps will want to employ TradeDesk's services to bring in more advertising revenue, meaning TradeDesk can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of TradeDesk's services.

70.    TradeDesk was founded in 2009 by Jeff Green with the intention of developing technology that would target the same consumer "across ad formats,

---

[18] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

including display, video, audio, native and social, on a multitude of devices, such as computers, mobile devices, and connected TV."[19]

71.    One of the ways TradeDesk is able to receive swaths of online user data is through a "Tracking Tag" "that is placed on a website to track visitor activity on the page . . ."[20]

72.    The Tracking Tag that TradeDesk develops is its Adsrvr Pixel that TradeDesk calls a "Universal Pixel."[21]

73.    "As its name suggests, the Universal Pixel allows management of multiple processes with just one pixel added to an entire website."[22]  "Universal pixels are dynamic and help capture every website visitor no matter what page they're on."[23]

74.    As such, TradeDesk is able to collect information on internet users' activity on a wide variety of websites through the use of its pixel.

75.    Specifically, TradeDesk collects information used to identify individuals across the internet including, but not limited to, cookies, IP addresses, email addresses, HTTP headers that specify information such as type of browser, device and operating system information, location information, and other unique identifiers associated with web addresses.[24]  In addition, TradeDesk collects information regarding the users' activity on websites and communications with websites in the form of full-string URLs and button click events.  Finally, TradeDesk

---

[19] *Fact Sheet*, THETRADEDESK, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.thetradedesk.com/assets/general/TTD-Fact-Sheet_121718.pdf (last accessed Feb. 11, 2025).

[20] *Tracking Tags*, THETRADEDESK, https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsOverview.

[21] *Universal Pixel*, THETRADEDESK, https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsUniversalPixel#universal-pixel-syntax (last accessed Feb. 12, 2025).

[22] *Id.*

[23] *Glossary–Universal Pixel*, THETRADEDESK, https://www.thetradedesk.com/us/glossary#terms-g (last accessed Feb. 14, 2025).

[24] *Id.*

---

pairs this information to anything it has otherwise collected about the user and has compiled into a profile of the user.

76.    Defendant knowingly and intentionally implemented TradeDesk's Adsrvr Pixel on its Website.

**F.    The Facebook Tracking Pixel**

77.    Facebook describes itself as a "real identity platform,"[25] meaning users are allowed only one account and must share "the name they go by in everyday life."[26]  To that end, when creating an account, users must provide their first and last name along with their birthday and gender.[27]

78.    Meta owns Facebook.com and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[28]  In 2021, Facebook generated $117 billion in revenue.[29]  Roughly 97% of that came from selling advertising space.[30]

79.    Meta sells advertising space by highlighting its ability to target users.[31] Meta can target users so effectively because it surveils user activity both on and off its site.[32]  This allows Meta to make inferences about users beyond what they

---

[25] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, Wall. St. J. (Oct. 21, 2021).

[26] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[27] META, SIGN UP, https://www.facebook.com/

[28] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[29] META, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[30] *Id.*

[31] META, WHY ADVERTISE ON FACEBOOK INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[32] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

explicitly disclose, like their "interests," "behavior," and "connections."[33]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[34]

80.    Advertisers can also build "Custom Audiences."[35]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[36]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[37]

81.    Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[38]

82.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others,

---

[33] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[34] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[35] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[36] *Supra* note 34.

[37] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[38] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; META, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

---

integrate with Meta, understand and measure their products and services, and better

reach and serve people who might be interested in their products and services."[39]

83.    Meta's Business Tools are bits of code that advertisers can integrate into

their website, mobile applications, and servers, thereby enabling Meta to intercept

and collect user activity on those platforms.

84.    The Business Tools are automatically configured to capture certain data,

like when a user visits a webpage, that webpage's Universal Resource Locator

("URL") and metadata.[40]  However, Meta's Business Tools can also track other

events.  Meta offers a menu of "standard events" from which advertisers can choose,

including what content a visitor views or purchases.[41]  Advertisers can even create

their own tracking parameters by building a "custom event."[42]

85.    One such Business Tool is the Facebook Tracking Pixel.  Meta offers

this piece of code to advertisers, like Advanced Hair, to integrate into their websites.

As the name implies, the Facebook Tracking Pixel "tracks the people and type of

actions they take."[43]  When a user accesses a website hosting the Facebook Tracking

Pixel, Meta's software surreptitiously directs the user's browser to simultaneously

send a separate message to Meta's servers.  This second, secret transmission contains

the original GET request sent to the host website, along with additional data the Pixel

---

[39] META, THE META BUSINESS TOOLS, https://www.facebook.com/help/
331509497253087.

[40] See META, META PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://
developers.facebook.com/docs/facebook-pixel/advanced/; see also META, BEST PRACTICES FOR
META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=
1205376682832142; META, APP EVENTS API, https://developers.facebook.com/docs/
marketing-api/app-event-api/.

[41] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://
www.facebook.com/business/help/402791146561655?id=1205376682832142.

[42] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/
business/help/964258670337005?id=1205376682832142; see also META, APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

[43] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code, and Meta's embedded code.

86.     An example illustrates the point.  Take an individual who navigates to https://www.advancedhair.com/ and clicks on "Free Consultation."  Once the individual enters in their information (i.e., the appointment location, the date and time, their full name, their email address, and their phone number), the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser or mobile phone, without alerting the individual that this is happening.  Meta causes the browser to secretly and simultaneously duplicate the communication with Advanced Hair, transmitting it to Meta's servers alongside additional information that transcribes the communication's content and the individual's identity.

87.     This includes information when a consumer schedules a consultation for hair transplant surgery.

88.     In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Meta at the same time as they are being sent to Advanced Hair.  Thus, Meta's interception of these communications occurs "in transit."  *See*, *e.g.*, *In re Facebook Internet Tracking Litigation*., 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device.

Section 631's protections extend explicitly to the beginnings and ends of communication . . ."); *James v. Walt Disney Co.*, F. Supp. 3d 942, 960–62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on a similar process to the one alleged herein).

89.     After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.  In order to engage in the above-described processing, analysis and assimilation, on information and belief, Meta has to view the information being processed, analyzed and assimilated.  As such, Meta regularly viewed and used Plaintiff and Class Members' communications that it intercepted via the Facebook Tracking Pixel.

90.     Meta's other Business Tools function the same.  For mobile applications, advertisers can utilize the Meta SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[44]

91.     Advertisers can also utilize the "Conversions API."  The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[45]  More technically, the Conversions API is Meta code that advertisers can implement server-side.[46]

92.     Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Meta's Conversion API endpoint."[47]

---

[44] META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[45] META, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api. This refers to device specific privacy controls.

[46] *Id.*

[47] *Id.*

93.     When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[48] As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[49]  Meta "recommend[s] that advertisers implement the Conversions API alongside their Facebook Tracking Pixel and follow other best practices."[50]

94.     Meta confirms, in its "Meta Business Tools Terms,"[51] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[52]  In other words, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.[53]

95.     Meta also can and does connect all information it intercepts to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[54]

---

[48] Id.

[49] META, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[50] Id.

[51] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[52] Id.

[53] Id.

[54] Id.

---

96.    Further, Meta can and does use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[55]

97.    Finally, Meta can and does use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[56]

98.    Thus, Meta uses the information it wiretaps for purposes other than simply providing a recording to its customers, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

99.    The Facebook Tracking Pixel is employed on the Defendant's website in the manner described throughout this Complaint.

**G.    Defendant's Use of the Tracking Technologies**

100.    Pursuant to agreements with Third Parties (*e.g.*, Google, TradeDesk, and Meta), Defendant intentionally and voluntarily embedded the Tracking Technologies onto the Website.  As illustrated within this section, Defendant unlawfully disclosed PII and sensitive appointment details via the Tracking Technologies to Third Parties, without consumers' consent.

101.    The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website user's communications and inputs to the corresponding User IDs, much like a traditional wiretap.

102.    For example, when individuals visit Defendant's Website via an HTTP request to Defendant's servers, Defendant's server sends an HTTP response

---

[55] *Id.*

[56] *Id.*

(including the Markup) that displays the webpage visible to the user, along with Source Code (including the Tracking Technologies).

103.   Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the consumer's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Google, TradeDesk, and Meta, or other other third parties.

104.   Third Parties —including Google, TradeDesk, and Meta—offer companies, including Defendant, snippets of code they can install in web browsers of users logged into their services.  These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and appointment information).

105.   Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails) and the "content" of these communications (the buttons, links, pages, full-length URLs, and tabs they click/view related to the services sought from Defendant).

106.   Defendant installs these Tracking Technologies despite its understanding that its customers reasonably expect their sensitive and identifiable information to be kept confidential and undisclosed to Third Parties.

107.   From the moment clients enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the Third Parties.

108.   When users access the Website, Defendant discloses the URLs of every page that they visit, including during the booking process.  The URLs disclose the location of the appointment, the name of the consulting doctor, the patient's

unhashed email address, and the purpose of the consultation (for hair transplant surgery).  For example, when a patient submits a request for a free consultation, URLs of the page, which includes information about the appointment location, doctor, and PII of the Website user is collectively shared with Third Parties as enabled by Defendant.  *See, e.g.*, Fig. 4 (Google disclosures); Fig. 5–7 (TradeDesk disclosures); Fig. 8 (Meta disclosures).



**Figure 4**



**Figure 5**



**Figure 6**



**Figure 7**



**Figure 8**

109.    Defendant discloses even more confidential details about the appointment information and user PII to Third Parties in various forms throughout the booking process.

110.    For example, Defendant enabled the c_user, datr, and fr cookies which enables Meta to identify its account holders.  The c_user cookie value, which is a unique identifier assigned to each Facebook user allows Meta to associate its users with the interactions on Defendant's Website through a unique, Facebook "id". *See, e.g.* Fig. 8.

111.    Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications regarding their appointment details.

112.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

113.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[57]

114.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[58]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

115.    In 2017, researchers demonstrated that browser fingerprinting

---

[57] https://www.blog.google/products/chrome/building-a-more-private-web/
[58] https://www.pixelprivacy.com/resources/browser-fingerprinting/

techniques can successfully identify 99.24 percent of all users.[59]

116.   Browser-fingerprints are personal identifiers.  Tracking technologies,
like the ones developed by Google and utilized on the Website, can collect browser-
fingerprints from website visitors.

117.   Similarly, Google, as enabled by Defendant receives a unique "auid" or
"cid" value to assist it in identifying its users.  *See*, *e.g.* Fig. 4.

118.   TradeDesk is capable of identifying patients as well.  Plaintiff and other
Website users are prompted to provide Defendant with their name, email address,
phone number, and location of choice for their consultation.  When users
successfully schedule their consultation for hair transplant surgery, TradeDesk
receives each client's unhashed email address, which it associates with the client's
booking details (*e.g.*, location and doctor name).  *See, e.g.*, Figs. 5–7.

119.   TradeDesk then can and does take the information learned from each
Website user and adds the information to a comprehensive data profile regarding that
individual.  The added information makes the profile more comprehensive, and
therefore, more valuable to TradeDesk.

120.   In short, Third Parties can and do identify the precise individual making
the appointment.

**H.    Tolling**

121.   Any applicable statutes of limitations have been tolled by Defendant's
knowing and active concealment of its incorporations of the Tracking Technologies
onto the Website.

122.   The Tracking Technologies are entirely invisible to a website visitor.

---

[59] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-
fingerprinting-os-and-hardware-level-features/

123.   Through no fault or lack of diligence, Plaintiff and putative class members were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

124.   Plaintiff and putative class members were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

125.   Defendant had exclusive knowledge that the Website incorporated the Third Parties' Tracking Technologies and yet failed to disclose to its users, including Plaintiff, that by scheduling appointments through the Website, their PII and appointment information would be disclosed to Third Parties.

126.   Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users PII and appointment information.  In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII and purchase information to unauthorized third parties.  Accordingly, Defendant is estopped from relying on any statute of limitations.

127.   Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

128.   The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter.

## **CLASS ALLEGATIONS**

129.   Plaintiff brings this action on behalf of all persons in the United States who scheduled a consultation on the Website, www.advancedhair.com (the "Class").

130.   Plaintiff also brings this action on behalf of all California residents who scheduled a consultation on the Website, www.advancedhair.com (the "California Subclass").

131.   Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

132.   Excluded from the Class and California Subclass (collectively, the "Classes") are Defendant, the managers and members of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest.

133.   Plaintiff is a member of the Classes he seeks to represent.

134.   **Numerosity:** The Classes are so numerous that joinder of all members is impractical.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's and Third Parties' records.

135.   **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes that predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

(a)   Whether Defendant's acts and practices violated the ECPA;

(b)   Whether Defendant's acts and practices violated CIPA § 631;

(c)   Whether Defendant's acts and practices violated CIPA § 632;

(d)   Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution;

(e)    Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorney's fees, pre-judgment interest and costs of this suit.

136.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to Third Parties.

137.    **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

138.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

# CAUSES OF ACTION

## COUNT I
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511

139.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

140.   Plaintiff brings this claim on behalf of himself and members of the Class.

141.   The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

142.   The ECPA protects both the sending and the receipt of communications.

143.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

144.   The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

145.   The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

146.   The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

147.   The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

148.   The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5).

149.   The following instruments constitute "devices" within the meaning of the ECPA:

(a)    The computer codes and programs Defendant and Meta used to track Plaintiff's and Class Members' communications while they were navigating the Website;

(b)    The computer codes and programs Defendant and Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

(c)    The computer codes and programs Defendant and TradeDesk used to track Plaintiff's and Class Members' communications while they were navigating the Website;

(d)    Plaintiff's and Class Members' browsers;

(e)    Plaintiff's and Class Members' mobile devices;

(f)    Defendant's and Meta's web and ad servers;

(g)    Defendant's and Google's web and ad servers;

(h)    Defendant's and TradeDesk's web and ad servers;

(i)    The plan that Defendant and Meta carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

(j)    The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

(k)    The plan that Defendant and TradeDesk carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

150.    Plaintiff's and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

151.    By utilizing and embedding the tracking technologies provided by Meta, Google, and TradeDesk on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

152.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by Third Parties its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Third Parties.

153.    The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their hair transplant consultations.  This confidential information is then monetized for targeted advertising purposes, among other things.

154.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Third Parties through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

155.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic

communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

156.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy.

157.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

158.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

## COUNT II
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 631(a)

159.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

160.    Plaintiff brings this Count individually and on behalf of the members of the California Subclass.

161.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically,

acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

162.  CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

163.  The Third Parties' tracking technologies are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

164.  Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties have the capability to use the wiretapped information for their own purposes.  Accordingly, Google,

TradeDesk and Meta were third parties to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

165.   At all relevant times, by their tracking technologies, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

166.   At all relevant times, Third Parties used or attempted to use the communications intercepted by their tracking technologies for their own purposes.

167.   At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Third Parties to wiretap Plaintiff and Class Members using the Third Parties' tracking technologies and to accomplish the wrongful conduct at issue here.

168.   Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

169.   The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where Third Parties – as enabled by Defendant – routed Plaintiff's and Class Members' electronic communications to Third Parties' servers.

170.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

### COUNT III
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632

171.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

172.   Plaintiff brings this Count individually and on behalf of the members of the California Subclass.

173.   CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

174.   Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

175.   The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because Class Members had an objectively reasonable expectation of private with respect to their personally identifiable information and appointment data.

176.   Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential.  Plaintiff and Class Members did not expect third parties, and specifically Meta, Google, and TradeDesk, to secretly eavesdrop upon or record this information and their communications.

177.   The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

178.   By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

179.   At no time did Plaintiff or Class members consent to Defendant or Third Parties conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

180.   The Third Parties utilized Plaintiff's and Class members' PII for their own purposes, including advertising and analytics.

181.    Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties (i.e., Meta, Google, and TradeDesk).

182.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
### Invasion of Privacy Under California's Constitution

183.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

184.   Plaintiff brings this claim on behalf of himself and members of the California Subclass.

185.   The highly sensitive and personal information of Plaintiff and Class Members consists of private and confidential facts regarding sensitive medical procedures that were not intended to be shared or learned by anyone beyond the Website.

186.   Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized Third Parties.

187.   Defendant owed a duty to Plaintiff and Class Members to keep their PII confidential.

188.   Defendant's unauthorized disclosures, which go against Defendant's own Privacy Policy (*See* Fig. 1), to Third Parties is highly offensive to a reasonable person.

189.   Defendant's willful and intentional disclosure of Plaintiff's and Class Members' PII constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

190.   Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Third Parties' simultaneous eavesdropping and wiretapping of confidential communications.

191.   Defendant failed to protect Plaintiff's and Class Members' PII and sensitive appointment information and acted knowingly when it installed the Tracking Technologies onto the Website because the purpose of said technologies was to track and disseminate users' communications for marketing and advertising purposes.

192.   Because Defendant intentionally and willfully incorporated the Tracking Technologies onto the Website and encouraged individuals to use and interact with the Website and services thereon, Defendant had notice and knew that this practice would cause injury to Plaintiff and California Subclass.

193.   As a proximate and actual result of Defendant's acts and omissions, the PII and appointment information of Plaintiff and Class Members was disclosed to Third Parties, causing Plaintiff and Class Members to suffer damages.

194.   Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the

privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

195.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members since their PII and appointment information is still maintained by Defendant and is still in the possession of Third Parties, and the wrongful disclosure of this information cannot be undone.

196.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's and Third Parties' continued possession of their sensitive and confidential information.  A judgment for monetary damages will not undo Defendant's disclosure of the information to unauthorized Third Parties who, upon information and belief, continue to possess and utilize such information.

197.    Plaintiff, on behalf of himself and Class Members, further seeks injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII and medical appointment information and to adhere to its common law, contractual, statutory and regulatory duties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

1

(f)    For an order of restitution and all other forms of equitable monetary relief;

2

3

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

4

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

5

6

## JURY TRIAL DEMAND

7

Plaintiff demands a trial by jury on all causes of action and issues so triable.

8

9

Dated:  December 4, 2025                Respectfully submitted,

10

**BURSOR & FISHER, P.A**.

11

By:    */s/ Sarah N. Westcot*
                                        Sarah N. Westcot

12

13

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Email: swestcot@bursor.com

14

15

16

*Counsel for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28